WEST VIRGINIA TRACTION & ELECTRIC CO. v. ELM GROVE
MINING CO. et al.

(District Court, N. D. West Virginia. December 9, 1918.)

No. 46.

COURTS ⚙➡284—FEDERAL COURTS—ENFORCING FEDERAL LAWS—ORDER OF FUEL ADMINISTRATOR.

    Though, in the absence of diversity of citizenship, the federal court has no jurisdiction to determine the controversy of price at which defendant agreed to furnish coal to plaintiff, a public service corporation, it will, leaving that question for courts of competent jurisdiction, enjoin defendant from disobeying the order of a state fuel administrator, under the Lever Act, to continue furnishing plaintiff with coal till the act by its terms ceases to be in effect, by termination of the war, ascertained and proclaimed by the President.

In Equity. Suit by the West Virginia Traction & Electric Company against the Elm Grove Mining Company and others. On motions to award temporary injunction and, per contra, dissolve restraining order. Motion to dismiss denied, and application for temporary injunction granted.

John J. Coniff, of Wheeling, W. Va., for complainant.
Joseph Handlan, of Wheeling, W. Va., for defendants.

DAYTON, District Judge. The plaintiff here has filed its bill and amended bill, alleging in effect that it is a West Virginia corporation, a common carrier, operating some 16 miles of street railway in Wheeling, and from that city to the Pennsylvania line, at West Alexandria, also an electric power plant at Elm Grove, W. Va., and a waterworks just outside of Wheeling. It charges its car line accommodates, in transportation of passengers, freight, and express, among others, several hundred workmen in plants outside the limits of Wheeling, engaged in the manufacture of munitions for the government; that its electric power plant furnishes electricity to about 12,000 families, and

⚙➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

its waterworks water to about 1,500; that the defendant corporation is a West Virginia coal-mining corporation, operating at Elm Grove, of which defendant Paisley is president and defendant Skillcorn is manager; that on May 4, 1910, its predecessor, the City & Elm Grove Railway Company, made a contract with the predecessor of the defendant corporation, the Elm Grove Coal Company, which contract has been assumed by the plaintiff and defendant corporations for and on behalf of their respective predecessors, by which plaintiff was to be supplied with coal. An admitted copy of this contract is exhibited with the bill.

A bitter controversy turns upon the construction to be given certain of its provisions. By its terms, the defendants' predecessor, for itself, its successors and assigns, for 10 years from its date and so long thereafter as it should be able to supply the necessary quantity from its mine, undertook to furnish run of mine bituminous coal free from dirt, slate, and noncombustible material, in a quantity of 40 tons a day, subject, however, to the right of the purchasing corporation, by written notice given on the 1st of a month, to either increase or diminish the amount to be furnished until a similar notice on the 1st of another month was given to the contrary; the purpose being that the purchasing corporation should be furnished all the coal required for the operation of its power plant, if the selling corporation was able to furnish it. It is then stipulated that the selling corporation should erect a trestle from its mines to the power plant of the purchasing corporation, and in effect the latter should pay each year 6 per centum of its cost, so long as it was used for the delivery of such coal. For the coal, so delivered, the price to be paid was $1 per ton of 2,000 pounds, payable on the 20th of each month for the amount furnished the preceding month, subject to this condition:

"Whenever any increase or decrease shall be made from the mining rates now in force and operation, then the price to be paid by the said party of the second part (the purchasing corporation) to the said party of the first part (the selling corporation) for the coal delivered under the provisions of this agreement shall be increased or decreased, and such increase or decrease shall apply with respect to the price to be paid under this agreement whenever any subsequent changes in mining rates shall occur during the continuance in force of this agreement."

What was meant and included in the words "the mining rates," as used in this contract, has given rise to substantially the whole trouble between the parties. The plaintiff contends that the interpretation must be restricted to the cost of cutting and loading coal into mine cars at the miner's place of work. On the other hand, the defendants insist that it should include the total cost of production, presumably thereby meaning to include overhead and outside work, and fixed charges, such as interest, insurance, tax, and office expenses.

It is not likely that these terms were used in this contract without a mutual recognition of the fact that they were used in a sense generally understood by those engaged in mining coal. It would seem, therefore, to be an easy matter to determine from mine operators and mine workers this common understanding, and settle accounts accordingly. The plaintiff charges, in effect, that from May 4, 1910, the date

of the contract, to November, 1916, when it assigned the contract to the defendant corporation, a period of over 6 years, the Elm Grove Coal Company accepted compensation for the coal furnished at the price of $1.11 per ton, according to an agreed adjustment as to "the mining rates," in accord with plaintiff's interpretation of their meaning, but that about a month after it had become the assignee of the rights and obligations of the Elm Grove Coal Company, in December, 1916, the defendant corporation demanded a fixed price of $1.30 per ton; then in January, 1917, the sum of $1.44; in May following, $1.58 per ton, basing these demands on alleged increase in cost of production and 10 per cent. additional; and finally, on December 24, 1917, notified plaintiff, unless it settled for all coal furnished from November 1, 1916, at the rate of $1.90 per ton it would cease on January 1, 1918, furnishing it any at all.

The plaintiff charges it refused these demands, but made repeated requests to be furnished with data upon which the price payable for and on account of increased "mining rates" could be adjusted, which was refused—made propositions that a friendly suit be instituted to interpret the contract, or that the controversy be submitted to arbitration, which proposals were rejected. I cite the case as made out by the allegations of the bill, without taking the time to set forth wherein its charges are either denied or modified by the answer, because this motion is to dismiss, and, if there be issues of fact raised by such answer, they could only be settled after time had been given to bring forward the evidence to determine them.

But, be all these things as they may, it is very apparent, if this were all, there could be no possible excuse for this court taking jurisdiction of the matter in any way. Its right to do so is based upon these further facts: Congress passed an act approved August 10, 1917, commonly known as the Lever Act, "to provide further for the national security and defense by encouraging the production, conserving the supply, and controlling the distribution of food products and fuel," 40 Stat. 276. This act, by the terms of its twenty-fourth section, "shall cease to be in effect when the existing state of war between the United States and Germany shall have terminated, and the fact and date of such termination shall be ascertained and proclaimed by the President." Under the powers conferred by it, the President, by executive order of date August 23, 1917, designated and appointed Harry A. Garfield as Fuel Administrator to carry into effect the provisions of the act so far as relating to fuel, and authorized him to appoint all necessary assistants. In accord with this power, the Fuel Administrator so appointed promulgated a series of regulations whereby state administrators, county administrators, and local committees were provided for. In this state J. Walter Barnes was appointed such state administrator, Charles M. Ketchum was appointed as administrator and chairman of the local committee, composed of himself, James W. Ewing, and Roy B. Naylor, for Ohio county.

Without entering into minute detail, it suffices to say that when the demand of December 24, 1917, for $1.90 per ton was made by defendants, under penalty for noncompliance of their ceasing to furnish coal

on January 1, 1918, the plaintiff appealed to the state administrator to intervene and prevent such action. In the meantime the President, under and by virtue of the powers conferred upon him by this Lever Act, had fixed a maximum price for coal in this district of $2.45 per ton. The result of this appeal was that the state administrator, advised by his local committee, promulgated an order on December 29, 1917, directing the defendant coal company to continue to furnish coal at the price provided in the contract, or at a price not exceeding $2.45 per ton. An immediate contention arose between the parties as to the meaning of this order. The defendants insisted that under its terms they were permitted to charge the maximum price fixed by the President. The plaintiff insisted that the contract must govern, and no price greater than its terms provided could be charged.

Thereupon the local committee, "at the expressed and written request of both parties," took further action in the premises. They undertook to construe the meaning of the contract in the use of the words "mining rates." They concluded that the interpretation thereof contended for by the plaintiff was the true one, and should be held to mean "the cost of cutting and loading coal into mine cars at the miner's place of work." They further undertook to ascertain the changes in "mining rates," so construed, that had occurred since the date of the contract in May, 1910. They ascertained these changes to be three in number, and that the average contract price for the period, by reason of these changes, would be $1.49. For reasons, however, set forth in their report, they recommended a compromise price of $1.70 to be paid. This plaintiff agreed to pay for future deliveries, upon condition that all its rights under the contract were reserved to it. Upon this condition, it alleges, it from time to time tendered to pay this price for coal delivered, but it was refused, and, on April 17, 1918, the defendant corporation gave notice that it would stop furnishing on April 18, 1918, and did stop so doing from noon of that day, until required to furnish such coal by an order of the state fuel administrator issued on April 19, 1918. The state fuel administrator, rightly takes the position that he has no power to construe the terms of the contract, but that because the plaintiff is a public service corporation, and its need for the coal is apparent for the public welfare, he has right to require the coal company to furnish it. He thereupon issued this order of April 19, 1918, requiring the defendant to furnish coal at the price fixed by its contract, not to exceed the maximum price fixed by the President.

The defendant coal company refused to obey this order in practical effect. It gave notice on May 9, 1918, to plaintiff, that it would, on the following day, at noon, discontinue furnishing coal unless prior thereto it had been paid at the rate of $2.45 per ton of 2,000 pounds for all coal furnished since January 1, 1918, to May 4, 1918, and plaintiff in writing had agreed that it would continue to pay such price. Thereupon the plaintiff filed on May 10, 1918, its bill, upon which a temporary restraining order was granted by this court. A hearing was directed to be had on the 18th day of May following, continued to May 20th by agreement of counsel, when plaintiff filed an amended

bill, the defendants filed their motion, with grounds therefor in writing, to dismiss, and this motion and plaintiff's application for a temporary injunction were argued by counsel under agreement that the temporary restraining order should continue in effect until the decision of the court upon such application, and the further agreement that on or before the 23d of May, 1918, the defendants should be permitted to file their answer, which should be read as an affidavit in resistance of the motion for temporary injunction. This answer was filed on May 23d, and on October 1st the defendants further filed papers entitled "Statement of Account," and "Cost of Production by Companies, Panhandle Coal Operators' Association."

I greatly deplore the delay that has occurred in the decision of these questions. War conditions, quarantine regulations, and very greatly increased court work on account of criminal prosecutions under war statutes have been largely the cause of it. The questions involved are wholly ones of first impression, too, and have required careful consideration. I have hereinbefore said that the state fuel administrator rightly took the position that under the Lever Act he had no power to construe the existing contract between the parties; that he could only require, in the interest of the public welfare, that the plaintiff, as a public service corporation, should be supplied with coal necessary for its operation by the defendant coal company in execution of its contract and upon its contractual terms and conditions. It was not the purpose and intent of this Lever Act to abrogate existing contracts. By its express terms it so declares in these words:

"The maximum prices so fixed and published shall not be construed as invalidating any contract in which prices are fixed, made in good faith, prior to the establishment and publication of maximum prices by the commission."

In this contract, made and operated under without objection for more than 6 years, the price is fixed at $1 per ton, subject from time to time to increase or deduction in accord with changes occurring in the mining rates. That the Fuel Administration had and could have nothing to do with the controversy arising as to the meaning of these terms in the contract, or with the settlement of disputed accounts between parties growing out of different constructions thereof, is to me clear and conclusive. The parties had the plainest and simplest remedy. If the coal company desired to establish its contention, it had only to bring its action at law in any court of competent jurisdiction for the sums it felt itself entitled to, wherein a judicial construction of the contract would be made, and it would be awarded its compensation according to such construction. It admits its assumption of the contract. It may be one very unfavorable to its interests under present conditions; on the other hand, it may have been a very favorable one to it when executed 8 years ago, when the coal market was overstocked and prices very low. Be that as it may, it has assumed this contract, and it should abide by it, appealing to the courts to determine its construction and all controversies arising in the course of its execution.

For it, on the contrary, to determine to place its own construction on the contract, refuse to sue or arbitrate, within short intervals, charge increased sums over what had been paid to and accepted by its assignor

as the contract price for more than 6 years, until at last a sum over two times greater was demanded under penalty, within 24 hours, of ceasing to furnish coal at all, thereby necessitating a complete cessation of plaintiff's street car and lighting facilities, does not seem to me, under any conditions, to be in accord with equity and good conscience. To do so in war times, when the life and welfare of the country demand of us all every sacrifice for the common good, such a course becomes far more reprehensible. I am persuaded that to prevent just such lines of conduct was one of the purposes of Congress in the enactment of this Lever Act. No question is raised here as to its constitutionality, and I know of none that can be raised. Clearly it gives power to the President, through officers authorized to be and appointed by him, to so conserve and regulate the distribution of food and fuel in such way that greed and extortion should not run riot, and the ability of men, women, partnerships, and corporations to work for the successful ending of the country's conflict should not be either crippled or hindered.

That Barnes, as state fuel administrator, is a government officer, charged with governmental duties and obligations, cannot be questioned. That the order issued by him on April 19, 1918, requiring this coal company to continue supplying the plaintiff with coal, was within the scope of his power and duties as such government officer, it also seems to me, cannot be denied, in view of the terms and requirements of this Lever Act. The primary duty and obligation of federal courts are to construe and enforce the federal laws. For this purpose they were created.

It cannot be assumed that, because Congress did not expressly so provide, federal courts can shirk the responsibility of enforcing the administrative orders of the fuel administrators acting legally and rightly within the terms and requirements of this act. Therefore it is not only permissible, but an absolute obligation upon this court, upon the appeal here made, to see to it that this order of the state fuel administrator is enforced. Like him, it cannot and will not assume to construe the contract, or in any way attempt to settle the conflicting claims and accounts arising under it, but leave that for courts of competent jurisdiction to do, if the parties persist in disagreeing. That this court does not have jurisdiction to do so seems to me to be very clear, for the reason that a purely civil controversy is involved therein, with no diversity of citizenship existing between the parties.

The motion to dismiss will be overruled. The application for a temporary injunction will be granted, to be in force until further order of this court, but in no event longer than the expiration of the Lever Act by virtue of the President's proclamation of the end of the war. It will be limited alone to put in effective force the state fuel administrator's order of April 19, 1918, requiring the defendant coal company to continue to supply coal to plaintiff under the contract, expressly reserving to the parties all right to assert and maintain, in any court of competent jurisdiction, any and all claims, accounts, and demands, one against the other, as to the contract, its construction, and the price to be paid for the coal delivered and to be delivered. It will allow the plaintiff to make such payments as it may deem it should under the

contract make, and the coal company to receive the same, without in any way compromising or affecting their several rights under the contract.